UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division

Case Number:  11-61663-CIV-MORENO
ELECTRONICALLY FILED

**AIRCRAFT GUARANTY CORPORATION, TRUSTEE OF**
**CONTINENT AIRCRAFT TRUST 1087**
**270 W. Pearl, STE 103-B**
**Jackson, WY 83001**

    Plaintiff,

v.

**DIAMOND AIRCRAFT INDUSTRIES, INC.**
**1560 Crumlin Sideroad**
**London, Ontario**
**Canada  N5V 1S2**

    Defendant.
_____/

## AMENDED COMPLAINT WITH JURY DEMAND

Plaintiff Aircraft Guaranty Corporation, Trustee of Continent Aircraft Trust 1087, for its Complaint against Defendant Diamond Aircraft Industries, Inc. ("Diamond"), states as follows:

### THE PARTIES

1.    Aircraft Guaranty Corporation, Trustee of Continent Aircraft Trust 1087 ("Plaintiff"), is a Wyoming corporation and the trustee and real party of interest for Continent Aircraft Trust 1087, whose sole beneficiary is Mr. Karsten Damgaard-Iversen,

with its principal place of business at 270 W. Pearl, STE 103-B, Jackson, Wyoming 83001.[1]

2. Diamond Aircraft Industries, Inc. ("Diamond") is a Canadian corporation with its principal place of business at 1560 Crumlin Sideroad, London, Ontario, Canada N5V 1S2.

## JURISDICTION AND VENUE

3. Jurisdiction exists by virtue of diversity of citizenship under 28 U.S.C. § 1332 and 28 U.S.C. § 1367 because Plaintiff is domiciled in the United States and Diamond is a Canadian corporation with its principal place of business in Canada. The matter in controversy exceeds the amount or value of $75,000.00, exclusive of interests and costs.

4. Diamond is subject to the personal jurisdiction of this Court, and is amenable to service of process pursuant to Florida's long-arm statute, FLA. STAT. § 48.193, because Diamond has purposefully availed itself of the privilege of acting in Florida through its significant sales and marketing efforts in Florida. Diamond markets its aircraft to the general public and solicits buyers throughout the United States, especially in Florida. Further, Diamond's primary distributor for the U.S. aircraft market, Premier Aircraft Sales, Inc., is a Florida corporation with its principal place of business in Ft. Lauderdale, Florida.

5. Venue is proper in this Court under 28 U.S.C. § 1391(a)(3) because Diamond is subject to personal jurisdiction in this district.

---

[1] Per the Court's Order on May 23, 2013, this Amended Complaint replaces the original named Plaintiff, Continent Aircraft Trust 1087, with the real party in interest, Aircraft Guaranty Corporation, Trustee of Continent Aircraft Trust 1087.

2

## FACTUAL BACKGROUND

6.  Diamond manufactures an aircraft called the Diamond DA42 Twin Star ("DA42"). At all times relevant hereto, the DA42 was powered either by twin 1.7 liter turbo diesel engines ("1.7L" engines) or twin 2.0 liter turbo diesel engines ("2.0L" engines), both of which were manufactured by Thielert Aircraft Engines GmbH ("TAE"), a German corporation.

7.  Diamond evaluated and selected the TAE engines specifically for use on its DA42s. As such, at all times relevant to this action, the DA42 was only available with TAE engines.

8.  In April or May of 2005, TAE's auditors gave a report describing serious financial irregularities at TAE.

9.  In November of 2006, authorities in Hamburg, Germany released a 72-page report outlining the findings of an official investigation of TAE on the grounds that the company attempted to obtain bank loans and stock investors under false pretenses. The details of these investigations were also outlined in a German publication in December of 2006.

10. In the Spring of 2007, the German authorities opened a second investigation against TAE founder Frank Thielert and Chairman of the Board Georg A. Witthun, raising legal issues such as joint attempted fraud and joint attempted falsification of evidence.

11. Because of Diamond's close business relationship with TAE, it knew or should have known about these investigations and TAE's underlying financial problems.

12. Indeed, because the allegations against TAE involved the preparation of fraudulent invoices, Diamond would have been contacted early in the investigation, as Diamond was TAE's largest customer.

13. Despite Diamond's apparent knowledge of TAE's impending financial problems, Diamond never disclosed any of this information to Plaintiffs.

14. Diamond also failed to disclose to Plaintiffs that it was developing its own engine for the DA42.

15. Diamond began developing its own engine in or around June of 2005, which Diamond intended to replace the TAE engines on the entire fleet of DA42s. Diamond's development of an engine for its own airframe was extremely rare in the aircraft manufacturing industry.

16. TAE's financial instability and the development of Diamond's own engine would have been material to Plaintiffs in their decisions to purchase their DA42s.

17. On or around April 24, 2008, TAE entered into an insolvency proceeding in Germany, whereby all TAE engine warranties were voided.

18. Because of TAE's insolvency, the difficulty in getting replacement parts and services, and the voiding of the TAE engine warranties, the fair market value of the DA42 has severely diminished.

**DIAMOND'S AGENCY RELATIONSHIP WITH AUTHORIZED DISTRIBUTORS**

19. Diamond's authorized distributors and their employees were agents of Diamond.

20. Diamond created a network of authorized distributors across the U.S. through which it markets and sells aircraft in the U.S. market.

21. Diamond required its authorized distributors to execute written distributorship agreements, which specified the duties and obligations of the authorized distributors.

22. These distributorship agreements designated specific territories of the United States to each of the distributors and contractually obligated the distributors to market Diamond aircraft in those states.

23. Diamond provides the contact information for all of its U.S. authorized distributors on its website (www.diamondaircraft.com/buy), which enables U.S. customers to log onto Diamond's website, obtain information about Diamond's aircraft, and immediately receive Diamond's recommendation on where to purchase.

24. Diamond trained all of the staff of the authorized distributors on the operations of Diamond's aircraft and mandated strict inventory requirements and sales procedures.

25. Diamond also distributed periodic memoranda to its authorized distributors with updates on promotions or technical problems.  These memoranda provided the authorized distributors with precise statements to make to customers and precise guidelines to follow with respect to the issues in the memoranda, which Diamond required the authorized distributors to follow.

26. If distributors do not closely and carefully comply with Diamond's rules, Diamond can and will strip authorized distributors of their status.

27. Diamond participated in all aspects and phases of the sales processes.  Even when authorized distributors tried to achieve separation between customers and Diamond's corporate personnel, Diamond insisted on being a part of the transaction.

28. Diamond encouraged individual customers to take delivery of aircraft directly from Diamond's manufacturing facility in London, Ontario or charged the customer around $1,000.00 to have the aircraft delivered to the customer's location.

29. Further, Diamond's representatives often appeared alongside the authorized distributors in sales and promotional settings such as the American Owners and Pilots Association ("AOPA") Expos, Sun n' Fun, and the Experimental Aircraft Association ("EAA") AirVenture air shows in Oshkosh, Wisconsin. At these air shows, individuals from Diamond's corporate offices and individuals from Diamond's authorized distributors wore identical shirts and worked together to answer questions for potential customers.

30. To Diamond's customers, Diamond and its authorized distributors were indistinguishable, which was Diamond's intent.

### TAE ENGINE WARRANTY

31. Diamond created two standard Limited Warranty documents containing Diamond's own statements and representations regarding the length and reliability of the TAE engine warranty. Diamond provided these documents to its authorized distributors, and Diamond intended that these documents be communicated to prospective buyers of DA42 aircraft during the purchase process in order to induce such buyers to purchase the DA42.

32. Diamond and its authorized distributors provided these Limited Warranty documents in order to re-affirm prior representations Plaintiff received regarding the engine warranty.

33. The TAE engine warranty expressly covered the engines for 2,400 flight hours or 12 years. However, because the TAE engines relied on new and untested technology, the FAA placed limitations and restrictions on their use in aircraft.

34. One such restriction was that all TAE engines were assigned a Time Between Replacement ("TBR") of only 1,000 flight hours. This meant that all TAE engines in aircraft had to be removed, inspected, and replaced after only 1,000 flight hours.

35. The FAA later increased the TBR for the TAE engines to 1,200 flight hours, but this figure was still well short of the TAE warranty of coverage for 2,400 flight hours.

36. In order to compensate for the decreased TBR of the TAE engines due to the FAA restrictions, TAE prorated the cost for purchasing a replacement engine. The amount that TAE prorated the cost for the replacement engine varied depending on whether the FAA-imposed TBR was 1,000 flight hours or 1,200 flight hours. Ultimately, the amount that TAE prorated the cost for the replacement engine was designed to provide owners with a value equal to TAE's initial warranty coverage of 2,400 flight hours.

37. Because the TAE engine technology was new and untested, certain parts, such as the gearboxes, clutches, and other key engine components also had to be replaced every 300 flight hours for diagnostic purposes. While marketing and selling the DA42, Diamond and its representatives also stated the cost of replacing these parts was covered by the engine warranty.

38. Without the engine warranty covering the required replacements, the DA42 would have been far too expensive to operate and no reasonable purchaser would have elected to purchase it.

## COUNT 1
### (NEGLIGENT MISREPRESENTATION)

39. Mr. Karsten Damgaard-Iversen, a citizen of Denmark, is the sole beneficiary of Continent Aircraft Trust 1087 ("Continent Trust"). Mr. Damgaard-Iversen, an engineer by training, had owned several diesel-powered automobiles and was immediately interested in the DA42 when he read an article about Diamond's use of turbo-diesel engines in the DA42.

40. In August or September of 2006, Mr. Damgaard-Iversen personally flew a DA42 out of Retford Gamston Airport in the United Kingdom with a Diamond authorized representative believed to be Mr. Heinrich. The Diamond distributor at Retford Gamston Airport was Diamond Aircraft UK, Ltd.

41. During this flight, Mr. Damgaard-Iversen was told by Mr. Heinrich that the TAE engines would be revolutionary and covered by a warranty.

42. In reading about and researching Diamond, Mr. Damgaard-Iversen noted that Premier was mentioned in numerous publications alongside Diamond's name and appeared to be the largest authorized distributor for Diamond's aircraft. As such, he began negotiations and discussions with Ms. Susan McKenzie, the Sales Coordination Manager at Premier, in late December of 2006 or early January of 2007.

43. The majority of the communication between Ms. McKenzie and Mr. Damgaard-Iversen occurred between December of 2006 and February of 2007. These communications were primarily conducted by e-mail and telephone. In these

8

communications, Mr. Damgaard-Iversen made it clear to Ms. McKenzie that fuel economy and the engine warranty were the most important factors to him when considering the purchase of the DA42.

44. On multiple occasions between December of 2006 and February of 2007, Ms. McKenzie explained to Mr. Damgaard-Iversen that the aircraft would need periodic replacements of the clutches and gearboxes, which would be covered by the engine warranty. Because Mr. Damgaard-Iversen knew how much these replacements could cost, he sought additional assurance regarding the engine warranty.

45. On multiple occasions between December of 2006 and February of 2007, Ms. McKenzie expressed to Mr. Damgaard-Iversen that TAE and its engines were high quality. She explained that Diamond had worked closely with TAE in developing the turbo-diesel engines and that Diamond was extremely confident in TAE and the engine technology.

46. On February 6, 2007, Ms. McKenzie attached multiple documents to an email sent to Mr. Damgaard-Iversen. An Aircraft Specification Sheet attached to this email stated that the DA42 had a "reliable powerplant" and that the engines had a "full factory warranty" for "12 years or 2400 hours." Furthermore, a Limited Warranty document attached to this email stated that the DA42 engines were covered by a warranty for "parts and labor prorated over 2,400 hours or 12 years." These representations were consistent with information that Ms. McKenzie had expressed to Mr. Damgaard-Iverson on multiple occasions between December of 2006 and February of 2007.

47. Based on these representations made to Mr. Damgaard-Iversen by Ms. McKenzie regarding the engine warranty and the representations contained in the

9

documents emailed by Ms. McKenzie regarding the engine warranty, Mr. Damgaard-Iversen, through Plaintiff, decided to purchase a DA42 through Premier.

48. If the representations by Ms. McKenzie had not taken place, Plaintiff would not have purchased the DA42.

49. On or about February 2007, Mr. Damgaard-Iversen entered into a purchase agreement for a new DA42, Serial No. 42.AC076, for the sum of $569,164.00, which was eventually transferred to Plaintiff. The aircraft was purchased through Premier's Ft. Lauderdale sales center and a ferry pilot took delivery of the DA42 at Diamond's facility in London, Ontario in September of 2007 and flew the aircraft to Denmark.

50. The representations by Ms. McKenzie were negligent because at the time the representations were made, Diamond knew or should have known that TAE was suffering from serious financial instability and that it may not be in a position to support the engines or honor the lengthy warranties Diamond sold along with the DA42.

51. Diamond knew or should have known that its above misrepresentations would induce Mr. Damgaard-Iversen and Plaintiff to purchase its DA42, and Plaintiff reasonably relied on such misrepresentations in purchasing its DA42 and suffered damages.

52. As a direct and proximate result of Mr. Damgaard-Iversen's and Plaintiff's justified reliance on Ms. McKenzie's misrepresentations, Plaintiff suffered damages, including: (i) the value of the voided TAE engine warranty; (ii) the additional expenses incurred in repairing TAE engines no longer covered by warranty; and (iii) the diminution in value of the involved DA42.

## COUNT 2
### (FRAUDULENT MISREPRESENTATION)

53. The representations by Ms. McKenzie were fraudulent because at the time the representations were made, Diamond knew that TAE was suffering from serious financial instability and that it may not be in a position to support the engines or honor the lengthy warranties Diamond sold along with the DA42.

54. Diamond knew that Ms. McKenzie's above misrepresentations would induce Mr. Damgaard-Iversen and Plaintiff to purchase its DA42, and Mr. Damgaard-Iversen and Plaintiff reasonably relied on such misrepresentations in purchasing its DA42 and suffered damages.

55. As a direct and proximate result of Mr. Damgaard-Iversen's and Plaintiff's justified reliance on Ms. McKenzie's misrepresentations, Plaintiff suffered damages, including: (i) the value of the voided TAE engine warranty; (ii) the additional expenses incurred in repairing TAE engines no longer covered by warranty; and (iii) the diminution in value of the involved DA42.

## COUNT 3
### (FRAUDULENT CONCEALMENT)

56. In order to deceive and induce Mr. Damgaard-Iversen and Plaintiff to buy the DA42, Diamond failed to inform Mr. Damgaard-Iversen and Plaintiff that TAE was experiencing serious financial instabilities and that its ability to honor its engine warranties was questionable.

57. As compared to Mr. Damgaard-Iversen and Plaintiff, Diamond possessed superior knowledge concerning TAE's financial condition and had a duty to reveal that knowledge to Mr. Damgaard-Iversen and Plaintiff. Diamond was TAE's largest customer and had major business operations in close proximity to TAE's German

headquarters. Accordingly, Diamond was aware of news regarding TAE's financial and criminal problems. Specifically, Diamond was aware of a German publication from December 2006 which detailed TAE's financial and criminal problems.

58. In order to deceive and induce Mr. Damgaard-Iversen and Plaintiff to buy its DA42, Diamond also failed to inform Mr. Damgaard-Iversen and Plaintiff that Diamond had begun development of its own engine in or around June of 2005, which it intended to replace the TAE turbo-diesel engines in the DA42.

59. Diamond possessed exclusive knowledge regarding the development of Diamond's own replacement engine.

60. Mr. Damgaard-Iversen and Plaintiff demonstrated to Diamond its concerns about purchasing untested technology used in TAE's engines and was only considering the purchase due to the lengthy, extensive warranty and life-extension program that Ms. McKenzie touted during the sales process.

61. The concealed information was material to the transaction because had Mr. Damgaard-Iversen and Plaintiff known that TAE was experiencing financial instability such that TAE may not be able to honor its warranties, and/or if Mr. Damgaard-Iversen and Plaintiff had known that Diamond was developing its own engine intended to replace the TAE engine in the DA42, Plaintiff would not have purchased the DA42.

62. Diamond perpetrated the fraud upon Mr. Damgaard-Iversen and Plaintiff because Diamond benefitted from the sale of the DA42 to Plaintiff.

63. This concealment was deliberate and knowing, and was designed to cause, and actually did cause, detrimental reliance on the part of Mr. Damgaard-Iversen and Plaintiff.

64. At no time prior to purchase did anyone disclose to Mr. Damgaard-Iversen and Plaintiff that TAE was experiencing financial problems such that it may not be able to honor the engine warranty or that Diamond was in the process of developing its own engine, which was intended to replace the TAE engine in the DA42.

65. Plaintiff would not have purchased its DA42 if such disclosures had been made.

66. As a direct and proximate result of Diamond's concealment, Plaintiff has suffered damages.

## JURY DEMAND

67. Plaintiff demands a jury trial on all issues so triable.

**WHEREFORE**, Aircraft Guaranty Corporation, Trustee of Continent Aircraft Trust 1087, demands the following:

1. A judgment of monetary and compensatory damages, along with pre-judgment and post-judgment interest, in favor of Plaintiff against Diamond in an amount to be determined at trial; and

2. Such other relief as this Court may deem just and proper.

Dated:  June 3, 2013

        Respectfully submitted,

        /s/Juan Martinez
        Juan Martinez (FBN 9024)
        GRAYROBINSON P.A.
        1221 Brickell Avenue, Suite 1600
        Miami, Florida 33131-0014
        Telephone:  305-416-6880
        Facsimile:  305-416-6887
        E-mail:  juan.martinez@gray-robinson.com
        COUNSEL FOR PLAINTIFF
            -and-
        V. Brandon McGrath
        Michael A. Grim
        BINGHAM GREENEBAUM DOLL LLP
        2350 First Financial Center
        255 East Fifth Street
        Cincinnati, Ohio 45202
        Telephone: 513-455-7643
        Facsimile: 513-455-8500
        E-mail:Bmcgrath@bgdlegal.com
        E-mail: mgrim@bgdlegal.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of June, 2013, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to counsel of record.

        s/Juan Martinez
        Counsel for Plaintiff

4452994_3.docx