UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division

Case Number:  11-61663-CIV-MORENO
ELECTRONICALLY FILED

AIRCRAFT GUARANTY CORPORATION, TRUSTEE OF
CONTINENT AIRCRAFT TRUST 1087
270 W. Pearl, STE 103-B
Jackson, Wyoming 83001

     Plaintiff,

v.

DIAMOND AIRCRAFT INDUSTRIES, INC.
1560 Crumlin Sideroad
London, Ontario
Canada  N5V 1S2;

DIAMOND AIRCRAFT INDUSTRIES, GMBH
N.A. Ottostrasse 5
A-2700 Wiener Neustadt, Austria;

and

DIAMOND AIRCRAFT SALES U.S.A., INC.
Corporation Trust Center
1209 Orange Street
Wilmington, Delaware 19801

     Defendants.

_____

## THIRD AMENDED COMPLAINT WITH JURY DEMAND

Plaintiff Aircraft Guaranty Corporation, Trustee of Continent Aircraft Trust 1087, for its Third Amended Complaint against Defendants Diamond Aircraft Industries, Inc., Diamond Aircraft Industries, GmbH and Diamond Aircraft Sales U.S.A., Inc., states as follows:

## THE PARTIES

1.  Aircraft Guaranty Corporation, Trustee of Continent Aircraft Trust 1087 ("Plaintiff"), is a Wyoming corporation and the trustee and real party in interest for Continent Aircraft Trust 1087, whose sole beneficiary is Mr. Karsten Damgaard-Iversen, with its principal place of business at 270 W. Pearl, STE 103-B, Jackson, Wyoming 83001.[1]

2.  Diamond Aircraft Industries, Inc. ("Diamond Canada") is a Canadian corporation with its principal place of business at 1560 Crumlin Sideroad, London, Ontario, Canada  N5V 1S2.

3.  Diamond Aircraft Industries, GmbH ("Diamond Austria") is an Austrian corporation with its principal place of business at N.A. Ottostrasse 5, A-2700 Wiener Neustadt, Austria.

4.  Diamond Aircraft Sales U.S.A, Inc. ("Diamond USA") is a Delaware corporation with its principal place of business in Fort Lauderdale, Florida.

## JURISDICTION AND VENUE

5.  Jurisdiction exists by virtue of diversity of citizenship under 28 U.S.C. § 1332 and 28 U.S.C. § 1367 because Plaintiff is domiciled in Wyoming, Diamond Canada is a Canadian corporation with its principal place of business in Canada, Diamond Austria is an Austrian corporation with its principal place of business in Austria and Diamond USA is a Delaware corporation with its principal place of business in Florida. The matter in controversy exceeds the amount or value of $75,000.00, exclusive of interest and costs.

---

[1] Per the Court's May 23, 2013 Order, Plaintiff replaced the original named Plaintiff, Continent Aircraft Trust 1087, with the real party in interest, Aircraft Guaranty Corporation, Trustee of Continent Aircraft Trust 1087.

2

6. Diamond Austria, Diamond Canada and Diamond USA (collectively, "Diamond") are, as both a legal and practical matter, the same entity, with all strategic, operational, and governing authority for Diamond residing in the entity's worldwide nerve center, Diamond Austria.

7. Indeed, at all relevant times, all three Diamond "entities" named in this litigation operated under the same ownership and formal executive authority, with Christian Dries serving simultaneously as the Chief Executive Officer for Diamond Austria, Diamond Canada and Diamond USA.

8. Diamond USA has little to no assets and functionally operates as nothing more than an agent and/or alter-ego of Diamond Austria and Diamond Canada for the sole purpose of developing a market in the U.S. for Diamond Austria and Diamond Canada's products.

9. Diamond Austria perpetuated a fraud on its customers by attempting to use both Diamond USA and Diamond Canada as a shield from liability arising from aircraft purchases.

10. At all relevant times, corporate decisions for all three Diamond entities came from Diamond Austria.

11. Diamond is subject to the personal jurisdiction of this Court, and is amenable to service of process pursuant to Florida's long-arm statute, FLA. STAT. § 48.193, because Diamond has maintained continuous and systematic contacts with Florida by way of its significant sales and marketing efforts, its numerous contractual relationships with Florida distributors and purchasers, and its regular and purposeful direction of its products into the Florida market for nearly two decades.

12. Diamond entered the Florida market as early as 1997 when Diamond USA registered to do business in Florida with its principal place of business initially in Fort Pierce, Florida and subsequently in Sarasota, Florida for the purposes of marketing and selling Diamond products in Florida.

13. Since that time, Diamond has established a consistent physical presence in Florida. From 2000 through 2013, Diamond and its agents consistently attended the Sun 'n Fun trade show in Lakeland, Florida. At these trade shows, Diamond representatives set-up static displays, marketed new products, conducted demonstrations and took orders for new products from attendees.

14. For more than a decade, Diamond representatives and agents have attended trade shows in Florida for the purpose of selling Diamond's products and forming and maintaining business relationships. When attending these trade shows, Diamond's local sales agents and Diamond representatives appear together, wear identical Diamond attire and hold themselves out as representatives of Diamond.

15. In 2001, on behalf of Diamond Austria, Christian Dries accepted the type certificate from the Federal Aviation Administration ("FAA") for the DA-40 (a single engine variant of the DA42) in Lakeland, Florida, while attending the Sun 'n Fun trade show. Later, in 2003, Peter Maurer, President of Diamond Canada, attended Sun 'n Fun for the purpose of selling Diamond products to Florida consumers and took several orders on behalf of Diamond Austria for the DA42 Twin Star.

16. In 2006, Diamond designated the first ever Diamond Brilliance Flight Center in Naples, Florida.

17. Even as recently as June 2013, Diamond Austria signed a long-term partnership agreement to expand its presence at and extensive business relationship with Embry-Riddle Aeronautical University's Daytona Beach Campus, with on-site operations to begin in October 2013.

18. Upon information and belief, Diamond rented or leased facilities in Fort Pierce, Florida and in Sarasota, Florida to facilitate the sale of Diamond products in Florida.

19. Further, upon information and belief, Diamond operated a business in Florida whereby it employed persons to market and sell Diamond products in Florida.

20. Diamond markets its aircraft to the general public and solicits buyers throughout the United States, specifically targeting the Florida market.

21. In 2006, to further expand its presence in Florida, Diamond USA entered into an exclusive distribution agreement ("Distributor Agreement") with Premier Aircraft Sales, Inc. ("Premier"). Premier is a Florida corporation with its principal place of business in Fort Lauderdale, Florida. In the Distributor Agreement, Diamond USA stated that it was the exclusive distributor in the United States for all products manufactured by Diamond Austria and Diamond Canada. During this time, the sole officers/directors of Diamond USA were Christian Dries (then CEO of Diamond Austria, Diamond Canada and Diamond USA) and Peter Maurer (President of Diamond Canada and Diamond USA). Among other things, the Distributor Agreement required that Premier provide office space for Diamond representatives at Premier's Fort Lauderdale facility.

22. In addition to Premier's facilities, Diamond has authorized three additional service centers in Florida to provide service and support for aircraft manufactured by

both Diamond Austria and Diamond Canada. Upon information and belief, these services centers were required to enter into separate Service Center Agreements with the Diamond manufacturers, namely Diamond Canada and Diamond Austria. The service center locations include: PrimePlanes Aircraft Services, Inc., located in Naples, Florida; Daytona Aircraft Services LLC, located in Daytona Beach, Florida; and Southeast Aero Services, located in St. Augustine, Florida. All of these facilities are promoted on Diamond's website as authorized service centers.

23. Venue is proper in this Court under 28 U.S.C. § 1391(a)(3) because Diamond is subject to personal jurisdiction in this district.

## FACTUAL BACKGROUND

24. Diamond manufactures an aircraft called the Diamond DA42 Twin Star ("DA42"). At all times relevant hereto, the DA42 was powered either by twin 1.7 liter turbo diesel engines ("1.7L" engines) or twin 2.0 liter turbo diesel engines ("2.0L" engines), both of which were manufactured by Thielert Aircraft Engines GmbH ("TAE"), a German corporation.

25. Diamond Austria evaluated and selected the TAE engines specifically for use on its DA42s. As such, at all times relevant to this action, the DA42 was only available with TAE engines. Diamond Austria negotiated the purchase of the TAE engines and developed a document to be distributed to prospective buyers regarding the TAE warranties and guarantees.

26. In July 2005, Diamond Austria sought and received the type certificate from the FAA for the 1.7L engine and subsequently for the 2.0L engine for the DA42 aircraft. The type certificate is the authorization for Diamond Austria to manufacture and

sell the DA42 in the United States. Since then, Diamond Austria has retained control and responsibility for the type certificate for the TAE-powered DA42.

27. At all times relevant to this action, Diamond Austria manufactured the DA42 in Austria. The DA42s were then either ferry flown to Diamond Canada for subsequent delivery or were shipped in a kit from Austria for final assembly in Canada to be sold to North American consumers. Diamond sold DA42s to U.S. buyers, such as Plaintiff, either directly or through a third party distributor, such as Premier.

28. In April or May of 2005, TAE's auditors gave a report describing serious financial irregularities at TAE.

29. In or around June of 2005, Diamond Austria began developing its own engine in Austria, which Diamond intended to replace the TAE engines on the entire fleet of DA42s. Diamond's development of an engine for its own airframe was extremely rare in the aircraft manufacturing industry.

30. In November of 2006, authorities in Hamburg, Germany released a 72-page report outlining the findings of an official investigation of TAE on the grounds that the company attempted to obtain bank loans and stock investors under false pretenses. The details of these investigations were also outlined in a German publication in December of 2006.

31. In the Spring of 2007, the German authorities opened a second investigation against TAE founder Frank Thielert and Chairman of the Board Georg A. Witthun, raising legal issues such as joint attempted fraud and joint attempted falsification of evidence.

32. Because of Diamond's close business relationship with TAE, it knew or should have known about these investigations and TAE's underlying financial problems.

33. Indeed, because the allegations against TAE involved the preparation of fraudulent invoices, Diamond would have been contacted early in the investigation, as Diamond was TAE's largest customer.

34. On November 20, 2007, nearly six months prior to TAE's bankruptcy, Diamond Canada President, Peter Maurer, sent an e-mail to Michael Goldschmidt, then President of Diamond Austria declaring that TAE would be bankrupt soon and that the main thing was that TAE was "dying" even if it killed Diamond too.

35. Despite Diamond's knowledge of TAE's impending bankruptcy, Diamond continued to sell the DA42 solely with TAE engines and represent that the warranties and guarantees could be relied upon by prospective buyers.

36. Despite Diamond's knowledge of TAE's financial problems, Diamond never disclosed any of this information to the Plaintiff.

37. Diamond also failed to disclose to the Plaintiff that it was developing its own engine for the DA42.

38. TAE's financial instability and the development of Diamond's own engine would have been material to Plaintiff's decision to purchase its DA42.

39. On or around April 25, 2008, TAE entered into an insolvency proceeding in Germany. Subsequent thereto, TAE voided all of the engine warranties and guarantees.

40. On May 30, 2008, Diamond presented a status update of TAE-powered Diamond airplanes to the European Aviation Safety Agency ("EASA"). In the

presentation, Diamond stated that the "operation of a TAE powered aircraft is simply no longer economically viable" and that "the TAE four cylinder engine family is not viable and has no future."

41.     Three days later, on June 2, 2008, Diamond Austria applied for the type certificate from the FAA for the Austro AE300 engine, the intended replacement engine for the TAE 1.7L and 2.0L engines.  On July 29, 2009, the FAA issued the type certificate for the Austro engine to Diamond Austria, which was subsequently transferred on December 21, 2009 to Austro Engine GmbH, a newly formed company controlled by Christian Dries and Diamond Austria.

42.     Because of TAE's insolvency, the difficulty in getting replacement parts and services, the dramatic increase in the cost of spare parts, and the voiding of the TAE engine warranties and guarantees, the fair market value of the DA42 has severely diminished.

## DIAMOND'S AGENCY RELATIONSHIP WITH AUTHORIZED DISTRIBUTORS

43.     Diamond's authorized distributors and their employees were agents of Diamond.  Diamond's authorized distributors were an extension of Diamond and were an integral part of the sales process, before, during and after the sale.

44.     Diamond created a network of authorized distributors across the U.S, including in Florida, through which it markets and sells aircraft in the U.S.

45.     Diamond required its authorized distributors to execute written distributorship agreements, which specified the duties and obligations of the authorized distributors.

46. These distributorship agreements designated specific territories of the United States to each of the distributors and contractually obligated the distributors to market Diamond aircraft in those states.

47. Diamond provides the contact information for all of its U.S. authorized distributors on its website (www.diamondaircraft.com/buy), which enables U.S. customers to log onto Diamond's website, obtain information about Diamond's aircraft, and immediately receive Diamond's recommendation on where to purchase.

48. Diamond trained all of the staff of the authorized distributors on the operations of Diamond's aircraft and mandated strict inventory requirements and sales procedures.

49. Diamond also distributed periodic memoranda to its authorized distributors with updates on promotions or technical problems. These memoranda provided the authorized distributors with precise statements to make to customers and precise guidelines to follow with respect to the issues in the memoranda, which Diamond required the authorized distributors to follow.

50. Diamond required that the authorized distributors incorporate the TAE warranty in its order form and that it be included in the terms of sale contained in the sales agreement for each and every purchaser, such as Plaintiff.

51. If distributors do not closely and carefully comply with Diamond's rules, Diamond can and will strip authorized distributors of their status.

52. Diamond encouraged individual customers to take delivery of aircraft directly from Diamond's facility in London, Ontario or charged the customer around $1,000.00 to have the aircraft delivered to the customer's location.

53. Diamond participated in all aspects and phases of the sales process. Further, Diamond's representatives often appeared alongside the authorized distributors in sales and promotional settings such as the Aircraft Owners and Pilots Association ("AOPA") Expos, Sun n' Fun, and the Experimental Aircraft Association ("EAA") AirVenture air shows in Oshkosh, Wisconsin. At these air shows, individuals from Diamond's corporate offices and individuals from Diamond's authorized distributors wore identical shirts and worked together to answer questions for potential customers.

54. To Diamond's customers, Diamond and its authorized distributors were indistinguishable, which was Diamond's intent.

## TAE ENGINE WARRANTY

55. Diamond created a standard Limited Warranty document containing Diamond's own statements and representations regarding the length and reliability of the TAE engine warranty. Diamond provided these documents to its authorized distributors, and Diamond required that these documents be communicated to prospective buyers of DA42 aircraft during the purchase process in order to induce such buyers to purchase the DA42.

56. Diamond and its authorized distributors provided this Limited Warranty document in order to re-affirm prior representations Plaintiff received regarding the engine warranty.

57. The TAE engine warranty expressly covered the engines for 2,400 flight hours or 12 years. However, because the TAE engines relied on new and untested technology, limitations and restrictions were placed on their use in aircraft.

58. One such restriction was that all TAE engines were initially given a Time Between Replacement ("TBR") of only 1,000 flight hours. This meant that all TAE engines in aircraft had to be removed, inspected, and replaced after only 1,000 flight hours, which was unique among competitive engines in the general aviation industry.

59. The TBR was later increased for the TAE engines to 1,200 flight hours, but this figure was still well short of the TAE warranty of coverage for 2,400 flight hours.

60. In order to compensate for the decreased TBR of the TAE engines due to the restrictions, TAE prorated the cost for purchasing a replacement engine. The amount that TAE prorated the cost for the replacement engine varied depending on whether the TBR was 1,000 or 1,200 flight hours. Ultimately, the amount that TAE prorated the cost for the replacement engine was designed to provide owners with a value equal to TAE's initial warranty coverage of 2,400 flight hours.

61. Because the TAE engine technology was new and untested, certain parts, such as the gearboxes, clutches, and other key engine components, also had to be replaced every 300 flight hours for diagnostic purposes. While marketing and selling the DA42, Diamond and its representatives also stated the cost of replacing these parts was covered by the engine warranty.

62. Without the engine warranty covering the required replacements, the DA42 would have been far too expensive to operate and no reasonable purchaser would have elected to purchase it.

63. Mr. Karsten Damgaard-Iversen, a resident of Reno, Nevada, is the sole beneficiary of Continent Aircraft Trust 1087 ("Continent Trust"). Mr. Damgaard-Iversen, an engineer by training, had owned several diesel-powered automobiles and was

immediately interested in the DA42 when he read an article about Diamond's use of turbo-diesel engines in the DA42.

64. On or about September 9, 2006, Mr. Damgaard-Iversen personally flew a DA42 out of Retford Gamston Airport in the United Kingdom with Mr. Henrik Burkal, a sales authorized representative with Diamond Aircraft UK, Ltd.

65. During this flight, Mr. Damgaard-Iversen was told by Mr. Heinrich that the TAE engines would be revolutionary and covered by a warranty. Mr. Heinrich provided Mr. Damgaard-Iversen a Diamond document which stated that the DA42 was covered by a "2 years spinner to tail" warranty "plus a manufacturer's guarantee of 2,400 hours on each engine."

66. On or about December 2006, Mr. Damgaard-Iversen found a listing on an industry website, Trade-A-Plane, which advertised a new DA42. The listing, which was placed by Premier, stated that the DA42 had a full factory warranty with engines covered for 12 years or 2,400 hours.

67. In reading about and researching Diamond, Mr. Damgaard-Iversen noted that Premier was mentioned in numerous publications alongside Diamond's name and appeared to be the largest authorized distributor for Diamond's aircraft. As such, he began negotiations and discussions with Ms. Susan McKenzie, the Sales Coordination Manager at Premier, in late December of 2006 or early January of 2007.

68. The majority of the communications between Ms. McKenzie and Mr. Damgaard-Iversen occurred between December of 2006 and February of 2007. These communications were primarily conducted by e-mail and telephone. In these communications, Mr. Damgaard-Iversen made it clear to Ms. McKenzie that fuel

economy and the engine warranty were the most important factors to him when considering the purchase of the DA42.

69. On multiple occasions between December of 2006 and February of 2007, Ms. McKenzie explained to Mr. Damgaard-Iversen that the aircraft would need periodic replacements of the clutches and gearboxes, which would be covered by the engine warranty. Because Mr. Damgaard-Iversen knew how much these replacements could cost, he sought additional assurance regarding the engine warranty.

70. On multiple occasions between December of 2006 and February of 2007, Ms. McKenzie expressed to Mr. Damgaard-Iversen that TAE and its engines were high quality. She explained that Diamond had worked closely with TAE in developing the turbo-diesel engines and that Diamond was extremely confident in TAE and the engine technology.

71. On February 6, 2007, Ms. McKenzie attached multiple documents to an e-mail sent to Mr. Damgaard-Iversen. An Aircraft Specification Sheet attached to this e-mail stated that the DA42 had a "reliable powerplant" and that the engines had a "full factory warranty" for "12 years or 2400 hours." Furthermore, a Limited Warranty document attached to this email stated that the DA42 engines were covered by a warranty for "parts and labor prorated over 2,400 hours or 12 years." These representations were consistent with information that Ms. McKenzie had expressed to Mr. Damgaard-Iversen on multiple occasions between December of 2006 and February of 2007.

72. Based on these representations made to Mr. Damgaard-Iversen by Ms. McKenzie regarding the engine warranty and the representations contained in the

documents emailed by Ms. McKenzie regarding the engine warranty, Mr. Damgaard-Iversen, through Plaintiff, decided to purchase a DA42 through Premier.

73. If the representations by Ms. McKenzie had not taken place, Plaintiff would not have purchased the DA42.

74. On or about February 2007, Mr. Damgaard-Iversen entered into a purchase agreement for a new DA42, Serial No. 42.AC076, for the sum of $569,164.00, which was eventually transferred to Plaintiff. The aircraft was purchased through Premier's Fort Lauderdale sales center and a ferry pilot took delivery of the DA42 at Diamond's facility in London, Ontario in September of 2007 and flew the aircraft to Denmark.

75. In order to deceive and induce Mr. Damgaard-Iversen and Plaintiff to buy the DA42, Diamond failed to inform Mr. Damgaard-Iversen and Plaintiff that TAE was experiencing serious financial instabilities and that its ability to honor its engine warranties was questionable.

76. As compared to Mr. Damgaard-Iversen and Plaintiff, Diamond possessed superior knowledge concerning TAE's financial condition and had a duty to reveal that knowledge to Mr. Damgaard-Iversen and Plaintiff. Diamond was TAE's largest customer and had major business operations in close proximity to TAE's German headquarters. Accordingly, Diamond was aware of news regarding TAE's financial and criminal problems. Specifically, Diamond was aware of a German publication from December 2006 which detailed TAE's financial and criminal problems.

77. In order to deceive and induce Mr. Damgaard-Iversen and Plaintiff to buy its DA42, Diamond also failed to inform Mr. Damgaard-Iversen and Plaintiff that

15

Diamond had begun development of its own engine in or around June of 2005, which it intended to replace the TAE turbo-diesel engines in the DA42.

78. Diamond possessed exclusive knowledge regarding the development of Diamond's own replacement engine.

79. Mr. Damgaard-Iversen and Plaintiff demonstrated to Diamond its concerns about purchasing untested technology used in TAE's engines and was only considering the purchase due to the lengthy, extensive warranty and life-extension program that Ms. McKenzie touted during the sales process.

80. The concealed information was material to the transaction because had Mr. Damgaard-Iversen and Plaintiff known that TAE was experiencing financial instability such that TAE may not be able to honor its warranties, and/or if Mr. Damgaard-Iversen and Plaintiff had known that Diamond was developing its own engine intended to replace the TAE engine in the DA42, Plaintiff would not have purchased the DA42.

## COUNT 1

### (NEGLIGENT MISREPRESENTATION)

81. Plaintiff incorporates by reference paragraphs 1 through 80 of the Third Amended Complaint as though fully set forth herein.

82. The representations by Ms. McKenzie were negligent because at the time the representations were made, Diamond knew or should have known that TAE was suffering from serious financial instability and that it may not be in a position to support the engines or honor the lengthy warranties Diamond sold along with the DA42.

83. Diamond knew or should have known that its above misrepresentations would induce Mr. Damgaard-Iversen and Plaintiff to purchase its DA42, and Plaintiff reasonably relied on such misrepresentations in purchasing its DA42 and suffered damages.

84. As a direct and proximate result of Mr. Damgaard-Iversen's and Plaintiff's justified reliance on Ms. McKenzie's misrepresentations, Plaintiff suffered damages, including: (i) the value of the voided TAE engine warranty; (ii) the additional expenses incurred in repairing TAE engines no longer covered by warranty; and (iii) the diminution in value of the involved DA42.

## COUNT 2

### (FRAUDULENT MISREPRESENTATION)

85. Plaintiff incorporates by reference paragraphs 1 through 80 of the Third Amended Complaint as though fully set forth herein.

86. The representations by Ms. McKenzie were fraudulent because at the time the representations were made, Diamond knew that TAE was suffering from serious financial instability and that it might not be in a position to support the engines or honor the lengthy warranties Diamond sold along with the DA42.

87. Diamond knew that Ms. McKenzie's above misrepresentations would induce Mr. Damgaard-Iversen and Plaintiff to purchase its DA42, and Mr. Damgaard-Iversen and Plaintiff reasonably relied on such misrepresentations in purchasing its DA42 and suffered damages.

88. As a direct and proximate result of Mr. Damgaard-Iversen's and Plaintiff's justified reliance on Ms. McKenzie's misrepresentations, Plaintiff suffered damages,

including: (i) the value of the voided TAE engine warranty; (ii) the additional expenses incurred in repairing TAE engines no longer covered by warranty; and (iii) the diminution in value of the involved DA42.

## COUNT 3

### (FRAUDULENT CONCEALMENT)

89. Plaintiff incorporates by reference paragraphs 1 through 80 of the Third Amended Complaint as though fully set forth herein.

90. Diamond perpetrated the fraud upon Mr. Damgaard-Iversen and Plaintiff because Diamond benefitted from the sale of the DA42 to Plaintiff.

91. This concealment was deliberate and knowing, and was designed to cause, and actually did cause, detrimental reliance on the part of Mr. Damgaard-Iversen and Plaintiff.

92. At no time prior to purchase did anyone disclose to Mr. Damgaard-Iversen and Plaintiff that TAE was experiencing financial problems such that it might not be able to honor the engine warranty or that Diamond was in the process of developing its own engine, which was intended to replace the TAE engine in the DA42.

93. Plaintiff would not have purchased its DA42 if such disclosures had been made.

94. As a direct and proximate result of Diamond's concealment, Plaintiff has suffered damages, including: (i) the value of the voided TAE engine warranty; (ii) the additional expenses incurred in repairing TAE engines no longer covered by warranty; and (iii) the diminution in value of Plaintiff's DA42.

## JURY DEMAND

95.     Plaintiff demands a jury trial on all issues so triable.

**WHEREFORE**, Aircraft Guaranty Corporation, Trustee of Continent Aircraft Trust 1087, demands the following:

1.     A judgment of monetary and compensatory damages, along with pre-judgment and post-judgment interest, in favor of Plaintiff against Diamond in an amount to be determined at trial;

2.     A judgment of punitive damages in favor of Plaintiff against Diamond in an amount to be determined at trial;

3.     Recovery of attorneys' fees and costs; and

4.     Such other relief as this Court may deem just and proper.

Respectfully submitted,

/s/ Juan Martinez
Juan Martinez
Florida Bar No. 9024
GRAYROBINSON P.A.
1221 Brickell Avenue, Suite 1600
Miami, Florida 33131-0014
Telephone: 305-416-6880
Facsimile: 305-416-6887
E-mail: juan.martinez@gray-robinson.com
COUNSEL FOR PLAINTIFFS
-and-
V. Brandon McGrath
Michael A. Grim
BINGHAM GREENEBAUM DOLL LLP
2350 First Financial Center
255 East Fifth Street
Cincinnati, Ohio 45202
Telephone: 513-455-7643
Facsimile: 513-455-8500
E-mail:Bmcgrath@bgdlegal.com
E-mail: mgrim@bgdlegal.com