**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 11-CV-61663**
**ELECTRONICALLY FILED**

**AIRCRAFT GUARANTY CORPORATION,**
**TRUSTEE OF CONTINENT AIRCRAFT TRUST 1087**

      Plaintiff,

v.

**DIAMOND AIRCRAFT INDUSTRIES, INC.**
**DIAMOND AIRCRAFT INDUSTRIES, GMBH**
**DIAMOND AIRCRAFT SALES, USA, INC.**

      **Defendants.**

_____/

## AFFIDAVIT OF ERNEST S. ARVAI

1.    My name is Ernest S. Arvai and I serve as the President and Chief Executive Officer of The Arvai Group, Inc. ("The Arvai Group").

2.    I make this Affidavit based on my personal knowledge, and I am over the age of 18 years and competent to testify to the matters contained within this Affidavit.

3.    Plaintiff Aircraft Guaranty Corporation, Trustee of Continent Aircraft Trust 1087 ("AGC" or "Plaintiff") retained The Arvai Group as an expert witness in this case to evaluate the compensatory damages owed to Plaintiff.

4.    Attached to this Affidavit is an accurate and complete copy of the report I created with respect to the above-referenced action. In this report, I conclude that Plaintiff is entitled to compensatory damages in the amount of $663,584.00.

5.    My qualifications, the nature of my assignment, and the basis for my conclusions have been fully described in the attached copy of my expert report.

Further, the Affiant sayeth naught.

Ernest S. Arvai

Dated: January *29*, 2014

STATE OF *New Hampshire*
COUNTY OF *Rockengham*

SWORN TO AND SUBSCRIBED before me on this *29*, day of January 2014.

The Affiant, ERNEST S. ARVAI, is [   ] personally known to me or [ ✓ ] has produced

*driver licenses* as identification, which is current or has been issued within the

past five years and bars a serial number or other identifying number.

NOTARY PUBLIC
Commissioner Number:
My commission expires:

Nicole M Apkarian
Notary Public, State of New Hampshire
My Commission Expires Mar. 24, 2015

15118035_1.docx

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division
CASE NO: 11-61663-CIV-MORENO

AIRCRAFT GUARANTY CORPORATION, TRUSTEE OF | 
CONTINENT AIRCRAFT TRUST 1087 |
270 W. Pearl, STE 103-B |
Jackson, WY 83001 |
Plaintiff, |
|
v. |
|
DIAMOND AIRCRAFT INDUSTRIES, INC. |
1560 Crumlin Sideroad |
London, Ontario |
Canada N5V 1S2; |
|
DIAMOND AIRCRAFT INDUSTRIES, GMBH |
N.A. Ottostrasse 5 |
|
A-2700 Wiener Neustadt, Austria; |
and |
|
DIAMOND AIRCRAFT SALES U.S.A., INC. |
Corporation Trust Center |
1209 Orange Street |
Wilmington, Delaware 19801 |
Defendants. |

## EXPERT REPORT OF ERNEST S. ARVAI

Pursuant to FED.R.CIV.P. 26(a)(2)(B) the following is the written report of Ernest S. Arvai containing his opinions and their basis, information considered in forming the opinions, and summary exhibits supporting the opinions.

Respectfully submitted.

Ernest S. Arvai

**The Arvai Group, Inc.**
**Written Report of Ernest S. Arvai**

## I.     QUALIFICATIONS AND ASSIGNMENT

1. The Arvai Group, Inc. was retained by Aircraft Guaranty Corporation, trustee for Continent Aircraft Trust 1087 and asked to assess the economic damages resulting from alleged actions by Diamond Aircraft Industries, Inc., Diamond Aircraft Industries, GmbH, and Diamond Aircraft Sales USA, Inc., (collectively "Diamond Aircraft") with respect to negligent misrepresentation, fraudulent misrepresentation, and fraudulent concealment, (collectively the "Alleged Actions") in the sale of DA-42 aircraft equipped with engines manufactured by Thielert Aircraft Engines GmbH ("TAE").

2. I am President and CEO of The Arvai Group Inc., a firm I founded 22 years ago.   Prior to founding that company, I was Director of the Airline and Aviation Industry worldwide business unit at Arthur D. Little, Inc., an international management consulting firm.   I have worked extensively with aircraft manufacturers, engine manufacturers, airlines, corporate and general aviation aircraft operators and industry suppliers on a variety of consulting assignments, and have been extensively involved in the general aviation industry, including serving as a member of the Board of Directors of Liberty Aerospace.

3. I specialize in strategic, market and financial issues with aviation industry clients, and am frequently called upon for expert testimony on these issues, including economic damages.   I have previously testified in U.S. District Court, the United States Court of Federal Appeals, and before numerous arbitration panels of the American Arbitration Association.   I have also prepared expert reports for litigation conducted in Canada and Hong Kong.

4. I hold a BSE degree in Industrial Engineering from the University of Michigan and an MS degree in Industrial Administration from the Tepper School at Carnegie Mellon University.   I am also a Certified Public Accountant and an instrument-rated pilot.   My curriculum vitae and prior testimony experience is detailed in Appendix-A.

5. This report contains my opinions as well as the bases for those opinions, and is supported by the work that I have performed to date.   The opinions set forth in this report are based upon my review and analysis of: (i) relevant documents, pleadings, testimony and data in this (and related) matters; (ii) relevant articles and publicly available information and data sources; (iii) discussions with counsel and plaintiff, and (iv) my own knowledge and experience from working with clients in the aviation and aerospace industries.[1]   My investigation and consideration of the issues in this matter is ongoing.   Accordingly, my opinions are subject to revision based on the work I may complete in the future and further documents, data, testimony, and other materials I may review.

## II.     SUMMARY OF CONCLUSIONS

6. For the purposes of this report, The Arvai Group, Inc. assumes that Plaintiff will be able to prove that Diamond Aircraft is liable for the Alleged Actions, and that the Alleged Actions caused significant economic damage to Plaintiff and other DA-42 owners and operators.   This assumption is made only to create a basis for analyzing Plaintiff's damage claims resulting from the Alleged Actions.   The Arvai Group, Inc. does not express an opinion regarding liability.

---

[1]. A list of documents and information sources considered is included as Appendix-B.



The Arvai Group, Inc.
Written Report of Ernest S. Arvai

7. As a result of the Alleged Actions, Aircraft Guaranty Corporation, Trustee, was unable to economically operate its DA-42 aircraft, and suffered financial damages from diminution of aircraft value, loss of warranty coverage, loss of pro-rata engine guarantees, excess maintenance costs associated with product life limitations, and the inability to economically utilize the aircraft in the manner intended.

8. Those economic damages, which we estimate to be $663,584 are summarized in the remainder of this report.

## III.   STATEMENT OF OPINIONS THE WITNESS WILL EXPRESS

### A.   Background

9. Aircraft Guaranty Corporation is a Wyoming corporation and the trustee and real party of interest for Continent Aircraft Trust 1087[2], whose sole beneficiary is Mr. Karsten Damgaard-Iversen.   On or about February 6 2007, Mr. Damgaard-Iversen entered into a purchase agreement for a new Diamond DA-42 aircraft[3], serial number 42AC076, for the sum of $569,164.00.   The aircraft was delivered with the United States registration N56KD.   That aircraft was subsequently transferred from Mr. Damgaard-Iversen to the Plaintiff on or about 2 August 2007[4], with FAA security conveyance and bill of sale recorded on 20 September 2007[5].

10. Diamond Aircraft Industries, GmbH ("Diamond Austria"), an Austrian corporation, and Diamond Aircraft Industries, Inc., a Canadian Corporation, ("Diamond Canada") manufacture an aircraft named the Diamond DA-42 Twin Star ("DA-42").     During certain periods of time, DA-42 aircraft were assembled in Diamond Canada's London, Ontario facility.

11. The DA-42 is a modern design low wing twin engine monoplane, with seating for four to five occupants, including the pilot.   The DA-42 received EASA certification on May 13, 2004, and FAA certification on 22 July 2005.   The aircraft held a unique place in the market, as it was powered by turbo-diesel engines and could operate on JetA or JetA1 aviation fuel, which is less expensive than 100LL aviation gasoline used by competing piston-engined aircraft.

12. The engines for the DA-42 were manufactured by Thielert Aircraft Engines GmbH, a German corporation.   Two different engines were available for the aircraft, a 1.7 liter turbo-diesel ("1.7L") or a 2.0 liter turbo-diesel ("2.0L").   These engines are based on the Daimler-Benz turbo-diesel engine used in Mercedes automobiles, with propeller reduction drives and redundant hardware that is specific to aviation use.   Thielert modified and certified the engines for aviation use with Jet-A fuel, rather than automobile diesel fuel.

13. The DA-42 initially sold quite well in the flight training and personal aviation markets, as the aircraft, using the Thielert engines, was 30-40% more fuel efficient than its major light twin competitor, the Piper PA-44 Seminole.   The competing Piper aircraft is equipped with conventional Lycoming TO-360-E1A6D piston engines that burn 100LL aviation gasoline, which is typically more expensive than diesel fuel and unavailable in some parts of the world. The DA-42, first introduced in 2004, is also a much more modern aircraft than the PA-44, which first entered service in 1979.

---

[2]. FAA record of conveyance of title to Continent Aircraft Trust 1087 on September 18, 2007.
[3]. Premier Aircraft Sales Aircraft Sales Agreement and Addendum.
[4]. Aircraft Guaranty Lease and International Operation Authorization for N56KD.
[5]. FAA Aircraft Bill of Sale for N56KD.



2

The Arvai Group, Inc.
Written Report of Ernest S. Arvai

14. The DA-42 utilizes state of the art avionics technology, offering the Garmin 1000 "glass cockpit" integrated flight display with flat panel screens, similar to those found on modern airliners.   With operational capabilities that include integrated Visual Flight Rules (VFR) terrain awareness, Traffic Advisory System ("TAS"), an active traffic alert system, and a satellite data link to display weather information, the DA-42 is a modern, high technology aircraft.   The construction of the DA-42 utilizes carbon fiber composite materials, similar to those used in the Boeing 787 and Airbus A350, that are lighter than comparable metal construction and increase fuel economy.   The aircraft also utilizes advanced aerodynamics in its design, and incorporates the latest safety advances, including 26g seats, adding to its "high-tech" reputation.

15. The aircraft that is the subject of this case, N56KD, was equipped with several options, including the TKS de-icing system that enables flight into known icing conditions,    long-range fuel tanks, and the Honeywell KN 63 remote distance measuring equipment ("DME") and Integrated Becker 3500 remote automatic direction finder ("ADF").   N56KD was equipped with the 2.0L Thielert engines, model 125-02-99.

16. Thielert, with its innovative turbo-diesel for aviation, was a new entrant in the field of aviation engines.   The engine company had one major customer for new engine installations, Diamond for the DA-42, and the European version of the DA-40, and had secured a third application for the Cessna 172 single engine aircraft.

17. As a new engine that had not yet been proven through field service, the engine, upon certification, had a very limited life for certain components.   Often, in certifying an aircraft, fatigue testing is required to simulate the wear and tear that an aircraft, or engine, or component would experience in service to more accurately determine potential failure rates and to establish appropriate maintenance intervals.   This testing takes a considerable amount of time, and cannot be accomplished until the final designs for the product are frozen in the configuration to be marketed.   As a result, manufacturers often introduce an aircraft or engine with reduced intervals between maintenance visits, with the intent to increase those limits after appropriate data from on-going testing and field experience is provided to the certification authorities.

18. I know from direct experience that fatigue testing for composite materials can take considerable time and effort.   As a member of the Board of Directors of Liberty Aerospace, we were regularly apprised of the fatigue life extension program that was on-going to increase the number of hours of operation permitted for the composite airframe.   When initially certified, that limit was only 250 hours of fatigue life, but has since been upgraded multiple times to reflect the results of on-going testing. Because the testing was conducted 24 hours a day and 7 days a week, we could be assured that no customer aircraft would exceed the number of hours in the testing protocol, and were able to periodically update the restrictions to keep ahead of the highest utilization customers.

19. For an aircraft engine certification process and determining maintenance intervals, similar processes take place.   Each key component of the engine and its installation must be thoroughly tested.   Today's standards and certification processes are more complex and stringent than in the recent past, when most of the popular piston engines were first produced and certified, making the process more difficult to complete.

20. Thielert began production with low life limits for several elements of the engine, requiring maintenance at intervals much shorter than for competing piston engines.   Most light aircraft engines today have a fixed interval for a major overhaul at 2,000 hours, with only routine maintenance inspections and oil changes between those major overhauls.   The Thielert diesel



The Arvai Group, Inc.
Written Report of Ernest S. Arvai

engines have a much more complex set of maintenance requirements that make the engine more costly to maintain than competing piston engines.   At the time N56KD was manufactured and delivered to the purchaser, the Thielert engine had component replacements required at 300 hour intervals until it reached 1,200 hours, at which point the engine was required to be taken out of service.   Because these engines, unlike their piston engine contemporaries, could not be overhauled, they must instead be discarded and replaced with new engines.

21. The life limitations on Thielert engines are quite severe when compared with typical competing piston engines.   Competing piston engines are routinely overhauled and brought back to initial specification, and it is not unusual to see older training aircraft with more than 10,000 hours of service with its initial engine that has been overhauled 4 or 5 times still in service.   The requirement to discard the Thielert engine after only 1,200 hours and replace it, rather than overhaul it, is quite significant.   Were such an engine installed in an automobile, traveling at an average of 40 miles per hour, the engine would need replacement after only 48,000 miles.   Without strong warranty support and the pro-rata guarantee program to cover both the premature engine replacement and additional required checks, the DA-42 aircraft would not be economically viable for its intended purpose[6].

22. In addition to the overall engine life limitations, a number of components must be inspected or replaced at 300 hour intervals, including clutches and gearboxes.   Again, these intervals are quite low when compared with other aircraft engines, and are also costly as they require an aircraft to undergo significant additional down time when such inspections and maintenance are performed.

23.   To accomplish 2,400 hours of flying, a customer with a Thielert engine would require 6 to 22 clutch inspections that included a gearbox removal in the field, 6 fuel feed pump inspections or replacements, 6 gearbox inspections, 6 replacement clutches, 2 alternator inspections, 2 high pressure pump inspections, and 2 complete new engines at 1,200 and 2,400 hours.   Diamond aircraft estimated that the material cost alone, without shipping and labor, would be more than $220,000 for the first 2,400 hours, or $91.67 per hour[7].   Following Thielert's bankruptcy, Diamond, and its customers, expected costs to be closer to the scheduled maintenance cost of $13 per hour anticipated for this aircraft, and instead experienced excess costs 647% higher than anticipated costs, not including labor or shipping.   Diamond concluded that, "Operation of a TAE powered aircraft is simply no longer economically viable.   Private owners are parking the aircraft, small flight training operators are going out of business, large flight training operators are looking for alternatives."

24. Thielert was quite aware of the shortcomings of its engines, and was actively pursuing life extension programs prior to its bankruptcy.   An element of that awareness was its warranty program for the engines, which covered significant elements of the early inspection costs, and the guarantee program to deal with the life limitations in the event an engine reached the maximum life of 1,200 hours and needed to be replaced before life extensions could be completed.

25. Thielert offered a 2,400 hour pro-rata guarantee for its engines, and had life extension programs in place to extend the mandatory life limitation of its engines from 1,200 to 2,400 hours.   With the engine itself then certified for only 1,200 hours, Thielert instituted a program

---

[6]. Diamond aircraft drew the same conclusion in a PowerPoint presentation to EASA on May 30 2008, citing high additional costs for operation of a Thielert engine, Bates reference Diamond 009699.
[7]. EASA/Diamond Aircraft Meeting May, 20, 2008, Bates reference Diamond 009695-009700.



4

The Arvai Group, Inc.
Written Report of Ernest S. Arvai

under which it would replace the engine in a customer's aircraft if life extension programs were incomplete at that time on a pro-rata basis. Thus, a customer that reached the 1,200 hour point and needed to replace an engine would receive credit for the additional 1,200 hours to total the 2,400 hour warranty period, or pay 50% for the new replacement engines.

26. It was expected, when the aircraft was sold to Plaintiff, that Thielert would achieve full 2,400 hour engine life and the elimination of the 300 hour inspection requirements as it gained experience and proved to regulators that such frequent inspections were not necessary. Thielert planned to increase inspections intervals initially from 300 to 600 hours, and then from 600 to 1,200, a midway point in the life of the engine.

27. Unfortunately, Thielert filed for bankruptcy in April 2008. That bankruptcy resulted in a halt to life extension programs, and a voiding of the warranties and guarantee programs to customers who had purchased Thielert engines. The loss of warranty and guarantees, combined with the requirements for more frequent maintenance than was anticipated, and a shortage of spare parts, contributed to extraordinary high costs to operate the DA-42, and significantly diminished the value of the aircraft.

28. Diamond investigated alternative approaches to securing a diesel powerplant for its unique DA-42 aircraft, and chose to develop an alternative engine on its own. The Austro engine, manufactured by Diamond itself, was being advertised as an option as early as July 2008[8]. Development work on the Austro engine, which was completed and EASA certified in January 2009, after 42 months and at a cost of US$63 million[9]. Given the typical time frame for certification of a new aircraft engine, approximately four years, Diamond likely began work on this project in July 2005.

29. There is no other manufacturer of light aircraft that manufacturers its own engines. Cirrus, Cessna, Piper, Mooney, Beechcraft, and other competitors all purchase aircraft engines from other manufacturers. Teledyne Continental Motors and Textron Lycoming engines are the major players in the aviation piston engine market. While Thielert was the only diesel aircraft engine available in the appropriate size range at the time, Diamond's actions, to undertake the large expenditure to develop a new engine and invest more the $63 million[10] over a 42 month development program indicates the depth of their lack of confidence in Thielert.

30. In April 2008, 14 months after the purchase of N56KD, Thielert, the manufacturer of the engines installed on the aircraft, declared bankruptcy in Germany. Under German bankruptcy law, the warranties, including the pro-rata guarantees for the life extension program, were invalidated by the bankruptcy court. This effectively rendered a Thielert engine with 1,200 hours of use into a large piece of scrap metal, as the engine could not even be overhauled for re-installation into an aircraft. With two engines on each airframe, DA-42 owners were faced with a material change in the operating economics of their aircraft, and a major loss in value in the used aircraft marketplace.

31. After the Thielert bankruptcy, Diamond was provided an opportunity to acquire Thielert and through such an acquisition continue to provide customer support for the owners of the DA-42 aircraft. Diamond decided not to pursue that option.

---

[8]. Diamond Letter to DA42 Owner/Operators dated July 26, 2008.
[9]. AOPA reported Diamond received Austro certification after 42 months and $63 million of expenditures on 1/29/2009 in its on-line news briefs.
[10]. Id.



5

The Arvai Group, Inc.
Written Report of Ernest S. Arvai

### B.    Liability Assumptions

32. For the purpose of this report, The Arvai Group, Inc. ("TAG") assumes that Aircraft Guaranty Corporation will be able to prove that Diamond is liable for the Alleged Actions, and that the Alleged Actions caused significant economic damages to Aircraft Guaranty Corporation and other DA-42 owners and operators.   This assumption is made only to create a basis for analyzing Aircraft Guaranty Corporation damage claims resulting from the Alleged Actions. TAG does not express an opinion regarding liability.

### C.    Executive Summary

33. As a result of the Alleged Actions, Aircraft Guaranty Corporation was unable to economically operate its DA-42 aircraft and suffered financial damages from the loss of aircraft value, excessive maintenance costs, inability to cost-effectively utilize the aircraft, and the loss of warranty coverage.   These damages, in addition to legal and consulting services, were faced by the Plaintiff.   Based on TAG's analysis, the value of past and future damages currently quantified total $663,584 excluding legal costs.

34. The value of the Aircraft Guaranty Corporation damages are as follows:

| Summary of Damages | Past Damages | Future Damages | TOTAL |
|---|---|---|---|
| Diminution of Aircraft Value | $200,000 | $0 | $200,000 |
| Loss of Warranty Coverage | $10,228 | $0 | $10,288 |
| Loss of Pro-Rata Engine Guarantee | $0 | $177,954 | $177,954 |
| Excess Maintenance Expense associated with Life Limitations | $13,817 | $120,060 | $133,877 |
| Cost of Replacement Aircraft due to High Costs to fly at intended levels | $141,525 | $0 | $141,525 |
| TOTAL | $365,570 | $298,014 | $663,584 |

### D.    Analysis

35. The Diamond DA-42 is a modern, high technology aircraft that features a turbo-diesel engine that can operate on Jet-A fuel rather than 100LL aviation gasoline.   Because Jet-A is typically less expensive than 100LL, and more readily available in third world countries, the DA-42 had a unique market advantage over its competitors.

36. The Thielert engines offered on the DA-42, in 1.7L and 2.0L variants, were derived from the Daimler-Benz passenger car engines.   As is typical with either a new airplane or engine, initial certifications typically have limited life, and as long-term fatigue tests are completed, life extensions are granted that extend maintenance intervals.   Unfortunately, with the bankruptcy of Thielert, life extension programs, warranty coverage, and a pro-rata guarantee program that ensured costs equivalent to the full maintenance intervals anticipated, were lost.



6

The Arvai Group, Inc.
Written Report of Ernest S. Arvai

37. Aircraft Guaranty Corporation damages include diminution of value of its aircraft, the loss of operation of that aircraft due to life limited components, excessive maintenance costs resulting from additional inspections and an engine replacement requirement that render the aircraft economically unsuitable for its intended operations.   The Arvai Group has quantified Aircraft Guaranty Corporation economic damages in the following areas:

- Diminution of Aircraft Value
- Loss of Warranty Coverage
- Loss of Pro-Rate Guarantee Programs
- Excess Maintenance Expenses Associated with Life Limitations
- Costs for Replacement Aircraft during Down Time

### i.    Diminution of Aircraft Value.

38. After the bankruptcy of Thielert in April, 2008, the values of DA-42 aircraft equipped with Thielert engines experienced a dramatic drop in the marketplace.   Aircraft that were purchased new for over $600,000 and valued at close to the value of a new aircraft just prior to the bankruptcy, in the $575,000 to $600,000 range, due to high demand for new technology aircraft, plummeted by approximately $150,000-$200,000 overnight.

39. Several factors contributed to the diminution of value for these aircraft, which remain at significantly lower values today.   One factor is the loss of warranty support for the Thielert engines, and the recognition that an engine replacement would be required at 1,000 (1.7L) or 1,200 hours (2.0L).   No customer would purchase a DA-42 without an adjustment in value for engines with a low life limit that would need replacement.   As a result, the value for the aircraft essentially dropped by an amount that was approximately the value of two replacement engines, plus the costs to install those engines, roughly $200,000 in 2010, and now well over $250,000.

40. In addition, the operating economics of the Thielert powered DA-42 also impacted aircraft value through a reduction in demand.   With more frequent inspections and earlier replacement of life limited components, the economics of the aircraft that were superior to the competition suddenly worsened dramatically.   Diamond itself, in a presentation dated May 30, 2008, calculated the hourly operating cost increase of 647% from $13 to $84 per hour.   For an individual, flight school or business operator, such a cost increase resulted in the aircraft being economically obsolete and unusable for its intended purpose.   In a supply/demand market, this negatively impacted the prospect for future sales and the outlook for aircraft values.

41. Values for DA-42 and other aircraft are tracked by a number of aviation publications, including V-Ref and the Aircraft Blue Book.   Each of these publications provide value estimates for the DA-42 on a quarterly basis.

42. Each publication, in estimates of current market value for the Thielert-powered DA-42 aircraft, places a caveat on its market values.   The quoted valuations for the aircraft assume an engine change, and that the owner has converted from Thielert engines to Austro engines to meet their valuations, which are in line with other high technology aircraft in the marketplace. However, in footnotes to their values, VRef indicates that an aircraft with Thielert engines should deduct the cost of an engine change, and Aircraft Bluebook indicates that the aircraft price should be reduced by $150,000.



The Arvai Group, Inc.
Written Report of Ernest S. Arvai

43. The cost of an Austro engine change, under Diamond's conversion program, was $220,740 in July 2010[11].   When aircraft downtime and other factors cited above are considered, I estimate damages for diminution of aircraft value to be $200,000.

44. Diamond Aircraft, in its communication to owners, recognized the significant value loss in the aircraft.   In describing the re-engining option, Diamond indicated that "customers who invest in an Austro Engines or Lycoming retrofit should expect instant equity in their planes." They also caution customers not to be drawn into any hype suggesting that DA-42 aircraft are "$600,000 flowerpots" by recognizing that the industry viewpoint of the aircraft shortly after the Thielert bankruptcy was extremely negative[12].   Diamond, in its memorandum to owners dated April 10, 2010, notes that "with a market recovery, continued TAE support, and the ability to convert your aircraft to a specification that matches current new DA42NGs or DA42L360s that are valued more than the original DA-42tdi, there is real potential to significantly maximize the value of your DA42.[13]"

45. It is clear, both from market data, as reported by VRef and Aircraft Bluebook, as well as the acknowledgment from Diamond that values can "significantly" improve or owners could expect "instant equity" from a conversion that the original DA42tdi models have lost significant value.

46. At the relevant date, in early 2008, the market and prices for general aviation aircraft had not declined significantly or reached market trough, and in fact, new technology aircraft were holding their values well.   The VRef market letter for the 2nd quarter of 2008 indicated that "a bright spot in the market is any Bonanza, 182, Cirrus or Saratoga with a glass cockpit.   Today's buyer does not want a panel full of half-century old technology."   The DA42, which has the Garmin G-1000, the market leader in glass panel technology, would likely have joined that list without the difficulties of the Thielert bankruptcy.

### ii.   Loss of Warranty Support from Thielert.

47. Following the bankruptcy, Thielert customers lost warranty support for their engines.   The warranty "spinner to tail" for the aircraft was two (2) years, plus a manufacturer's guarantee of 2,400 hours on each engine.   The Pro Rata Manufacturer's Guarantee provided by Thielert is valid for a period of 12 years, 2,400 flying hours, or 2,800 hours of operating time according to the Full Authority Digital Engine Control ("FADEC") of the engine, whichever occurs first. Within the first two years, or 2,400 flying hours, or 500 flying hours for the clutch, clutch shaft, alternator, high pressure pump, feed pump, and rail pressure control valve, whichever comes first, owners were to receive full parts and labor support for repair or replacement through a TAE authorized service center.   Recognizing that the then current life limitations of 1,200 without the ability to overhaul an engine was unacceptable to the market, Thielert provided a pro-rata guarantee, paying half of the cost for replacement of an engine at the 1,200 hour point to be economically equivalent to a 2,400 hour life.

48. One difficulty with this process was a requirement for Thielert engines to be shipped back to Germany for repair or inspection, as Thielert did not authorize other service centers to conduct repairs under the guarantee.   This entailed significant shipping costs at the expense of owners to send components to and from Germany.

---

[11]. Diamond Aircraft letter to DA42 owners/operators dated July 26, 2010.
[12]. Diamond DA-42 Customer Assistance Program booklet dated December 2008.
[13]. Diamond letter to customers dated April 10, 2010.



The Arvai Group, Inc.
Written Report of Ernest S. Arvai

49. The Plaintiff's aircraft was equipped with the 2.0L engine.   The 2.0L engine proved a more reliable model, but engines also typically experienced unplanned costs. In fact, the 1.7L engine proved so problematic that Thielert, under their Pro-Rata guarantee, had planned to replace the 1.7L engines with the more reliable 2.0L models once the engines had reached their 1,000 hour life limitation, with the customer required to pay only 1000/2400, or 41.67% of the replacement cost.   Post the 2008 bankruptcy, the pro-rata guarantee was no longer valid, replacement 2.0L engines were not available, and customers had no viable option to keep their aircraft flying until Diamond introduced piston and diesel alternatives that became available in the fourth quarter of 2009.

50. Since introduced, the 2.0L engine has been the subject of several FAA Airworthiness Directives ("ADs") mandating maintenance activities.   These include:

- 2008-06-52   High Pressure Fuel Line, effective 4/30/08
- 2008-06-52   Emergency - Fuel Line, effective upon receipt
- 2008-22-23   Disc Springs in the Clutch, effective 11/19/08
- 2010-06-12   Rail Pressure Control Valve, effective 7/13/10
- 2010-11-09   Proportional Pressure Reducing Valve (PPRV) effective 9/9/10
- 2011-05-06   Timing Chain, effective 3/30/11
- 2011-07-09   Full Authority Digital Engine Control Software, effective 5/5/11
- 2011-23-01   Clutch Assemblies, effective 11/22/11
- 2012-02-05   Engine, effective 3/2/12
- 2012-26-12   Oil Filler Plug Vent Hole, effective 2/13/13
- 2012-26-13   Software Mapping, effective 2/13/13

51. The first three items, would have occurred within the warranty time period for Aircraft Guaranty Corporation, being within two years of the introduction of the aircraft into service. Normally, the costs of labor and materials for the required modifications would have been covered by Thielert.   However, post-bankruptcy, these elements were not covered.   We estimate that the additional costs to aircraft owners for these items would range between $7,000 and $10,000 based on the estimated costs to cure included in the Airworthiness Directive documents, and have utilized the midpoint of $8,500 for our analysis.

52. In addition to the ADs, any unexpected failure of a Thielert engine during the first two years of operation would have also been covered by warranty.   While the 2.0L TAE125-02-99 performed better than its 1.7L counterpart, it would not be considered a reliable engine when compared with its competing piston engines.   Unexpected maintenance items can and do occur with aircraft engines.   For a new technology engine, such as the Thielert diesel that was still in the stages of proving its long-term reliability, risks of failure would be greater than for more mature engine programs.

53. In working with aircraft companies, we have found that they typically budget approximately 2-3% of the list price of the engine annually to cover warranty claims during the warranty period. We believe 3% is a more appropriate estimate for the Thielert engine, which had a poor reputation for reliability.   Utilizing this industry "rule of thumb" and applying it to the price of a Thielert 2.0L engine, one would expect $610 in annual expenses based on the pre-bankruptcy $20,320 list price of a single engine in 2008, or $1,220 per aircraft for each year of the two year warranty period.   As a result, we compute the expected loss of warranty coverage for the two year warranty period to be about $2,440 per aircraft for the entire initial engine warranty period, in addition to warranty coverage of ADs, which are typically paid for by the manufacturer.



The Arvai Group, Inc.
Written Report of Ernest S. Arvai

54. N56KD was delivered on September 24, 2007, and was under warranty until the Thielert bankruptcy in April 2008, a period of 7 months.   As a result, N56KD lost 17 of the 24 months of warranty coverage, and we estimate that loss as 17/24ths of the range estimated above, or $1,728 for the ensuing warranty period.

55. As Airworthiness Directives are also typically covered under warranty or by the manufacturer, but were not because of the bankruptcy, the cost of compliance with ADs must be added to the costs for lost warranty.   The estimated $8,500 expense for ADs would bring this total to $10,228.

### iii.  Loss of Pro-Rate Engine Guarantee.

56. The Thielert engines that were installed on N56KD had not yet been certified to the life limits anticipated by Thielert and Diamond at the time the aircraft was delivered.   Testing to extend those life limits was ongoing at Thielert prior to bankruptcy, upon which those efforts ceased, to be resumed much later after new ownership was found for the company.

57. Thielert planned an engine life of 2,400 hours for the engine, with intermediate gearbox maintenance at 1,200 hours when the engine was mature.   The Thielert engine is somewhat unusual in that it has a fixed operating life, and cannot be overhauled once it reaches its life limitation, but instead must be scrapped.   Because this engine has a gearbox, which competing engines do not typically have, additional maintenance is required.

58. This is in sharp contrast to competing piston engines, which can be overhauled and typically offer a time between overhauls of 2,000 to 2,400 hours.   The result is that the Thielert engines were expected to have higher maintenance costs than their piston contemporaries, even once full expected life was reached.   However, because the Thielert engine was more fuel efficient and operated on lower cost JetA rather than traditional 100LL aviation gas, the economic tradeoffs for the engine would be positive once the product reached its expected life.

59. Thielert continued work on life extension programs for the engine until the time of its bankruptcy, however, it had not fully completed those programs.   As a result, the engine was only certified for a 1,200 hour life at the time of bankruptcy, versus a planned lifetime of 2,400 hours. In addition, gearbox inspections and maintenance were required at 300 hour intervals rather than the planned 1,200 hours.

60. Recognizing that an aircraft equipped with Thielert engines would be at an economic disadvantage that resulted from life extension work not yet being completed, Thielert provided an additional guarantee program for DA-42 owners.   That program, outlined in *Garantiebedingungen für den Centurion 2.0*[14], provided a pro-rata replacement of an aircraft engine with a new engine based on a 2,400 hour life for the first 12 years after purchase. Through this process, an owner that reaches the 1,200 hour point, at which time the engine requires replacement, would receive a 50% credit towards a new engine.

61. This guarantee was lost during the bankruptcy process, when the life extension program development came to a halt.   While subsequently the life of a 2.0L engine was increased to 1,500 hours, this still falls well short of the 2,400 hours initially guaranteed by Thielert, increasing the cost to owners significantly.   For each engine, the loss of the pro-rata warranty at the time of the bankruptcy resulted in a projected loss half the value of a replacement engine at

---

[14].  *Garantiebedingungen für den Centurion 2.0.*

ARVAI•GROUP

**The Arvai Group, Inc.**
**Written Report of Ernest S. Arvai**

the 1,200 hour point, when the engine would need replacement.   With a price per engine of $51,150, a 50% credit would have been worth $25,575 per engine, or $51,150 per aircraft, when the engines were due for replacement.

62. The Thielert guarantee also extended to the parts cost for the additional checks required for the life extension program.   Thus, parts should have been supplied free every 300 hours to offset the additional costs from the life limitations.   Post-bankruptcy, that was also lost.

63. The following table illustrates the required checks and value of the 12 year guarantee over the expected 2,400 hour life of the engine, which totaled $88,977 per engine.   As the aircraft had yet to hit 300 hours, because the owner decided to limit utilization due to high costs, the entire value of the guarantee was lost, or $177,954 in benefits based on costs at the time of the bankruptcy.

| Interval | Parts Cost | Labor | Shipping | Tax | Total | Value of Guarantee |
|---|---|---|---|---|---|---|
| 300 | $9,866 | $1,425 | $800 | $1,347 | $13,438 | $9,866 |
| 600 | $7,986 | $1,045 | $800 | $1,430 | $11,261 | $7,986 |
| 900 | $9,866 | $1,425 | $800 | $1,347 | $13,438 | $9,866 |
| 1,200 | $51,125 | $1,140 | $4,000 | $5,172 | $61,437 | $25,575 |
| 1,500 | $9,866 | $1,425 | $800 | $1,347 | $13,438 | $9,866 |
| 1,800 | $7,986 | $1,045 | $800 | $1,480 | $11,311 | $7,966 |
| 2,100 | $9,866 | $1,425 | $800 | $1,347 | $13,437 | $9,866 |
| 2,400 | $7,986 | $1,045 | $800 | $1,480 | $11,311 | $7,986 |
| TOTAL | | | | | $149,072 | $88,977 |

64.   In addition to the engine replacement, costs for intermediate inspections would also have been covered by the pro-rate guarantee program, including 300, 600 and 900 hour checks in excess of the planned periods.   The cost of these 300 hours checks have been added to the engine replacement guarantee in the table above, with the total value of the guarantee of $88,977 per engine, or $177,954 for the aircraft.

iv.    **Excess Maintenance Costs associated with Life Extension Program.**

65. Thielert's life extension program was cut short immediately after the bankruptcy, resulting in customers facing more frequent inspections and maintenance requirements than initially anticipated when purchasing the aircraft.   Thielert had communicated that it was hoping to provide life extensions that would entail only a single check at 1,200 hours required during the fixed 2,400 hour life of the engine.

66.   The Thielert pro-rata guarantee program also extended to many of the life limited components that were scheduled for maintenance at intervals as low as 300 hours until the life limitations on those components could be lifted by regulators after reviewing additional testing data and information from operational experience.   Because the Thielert guarantee would only have covered parts costs, the labor, shipping and taxes, which were significant, would not be covered and resulted in excessive maintenance costs for owners.



11

The Arvai Group, Inc.
Written Report of Ernest S. Arvai

67. Unfortunately, the excess cost for these checks every 300 hours beyond parts would be borne by customers.   These excessive maintenance costs would have been incurred even had the guarantee program continued, and represent the difference between the total cost and the value of the guarantee in the table shown above, approximately $60,095 per engine, or $120,190 for the aircraft.   We have estimated these costs as past and future based on the proportion of the 2,400 hour guarantee that the aircraft had flown, as shown in the summary table.

68. While subsequent to bankruptcy life extensions were made to bring the inspection interval to 600 hours, the outlook at the time of bankruptcy was quite uncertain, with 300 hour maintenance intervals required.

### v.   Loss of Use of Aircraft due to High Costs.

69. Many owners, including Plaintiff, chose to reduce their levels of flying to essential operations, as their aircraft were no longer cost-effective to operate. Plaintiff's aircraft was operated at a low level of utilization, as shown in the following summary of hours flown:

| Year | Hours Flown |
|---|---|
| Sept.-Dec. 2007 | 33.8 |
| 2008 | 37.9 |
| 2009 | 35.1 |
| 2010 | 34.6 |
| 2011 | 78.9 |
| 2012 | 17.7 |
| January through May 2013 | 9.7 |
| Total | 247.7 |

70. This resulted in Mr. Damgaard-Iversen, the Plaintiff's ultimate beneficiary, seeking other forms of transportation for his business travel, reducing his efficiency.   We believe, had costs been closer to predicted, that Mr. Damgaard-Iversen would have utilized the aircraft more extensively, on the order of 150 hours annually.   For the period 2008 to September 2013, we would have expected that the aircraft would have accumulated 1,012 hours, approximately 765 more hours than were actually flown. Because substitute transportation was required, we utilized a typical aircraft rental rate of $185 per hour for a comparable DA-42 to calculate the cost of substitute transportation, which equaled $141,525.   This estimate is conservative in that it does not compute the lost productivity experienced by Mr. Damgaard-Iversen which would have been above and beyond the anticipated cost for using a similar airplane.

## IV.   ANTICIPATED EXHIBITS

71. The Arvai Group has not yet prepared the exhibits it anticipates using at trial.   As previously stated, information received subsequent to the date of this report will affect our analysis, as discovery has not yet closed.   Therefore, we reserve the right to prepare exhibits based on such information.

## V.   STATEMENT OF COMPENSATION

72. Aircraft Guaranty Corporation will compensate Mr. Arvai for his testimony in this case as follows:



**The Arvai Group, Inc.**
**Written Report of Ernest S. Arvai**

- Normal billing rate for report and preparation work: $400 per hour, plus expenses
- Courtroom time: $500 per hour, plus expenses
- Deposition time: $500 per hour, plus expenses



The Arvai Group, Inc.
Written Report of Ernest S. Arvai

**APPENDIX-A**

**Curriculum Vitae:   ERNEST STEPHEN ARVAI**

Ernie Arvai is President and CEO of The Arvai Group, Inc., the company he founded in 1991. He has more than 30 years of management and consulting experience and has counseled senior executives internationally on a variety of issues.   He specializes in strategic and operational issues in the airline and aviation industries.

He has significant experience in working with aircraft manufacturers, airlines, leasing companies, suppliers, operators, airports, governments, and financiers on a wide variety of issues, including business strategy, market and financial issues, and is widely recognized as an aviation industry expert.   He has specific expertise in aircraft finance and operating economics and has frequently been called on for expert testimony focused on economic issues.

Mr. Arvai was formerly Vice President and Managing Director, Technology Management at Battelle Memorial Institute, where he was responsible for the research institute's activities in global management consulting. Prior to his tenure at Battelle, he was a Director at Arthur D. Little, Inc. where he was responsible for the firm's worldwide activities in the Airline and Aviation Industries, headed that business unit, and co-directed the firm's practice in travel, tourism and hospitality.  Earlier in his career, he was a consultant with Arthur Andersen & Company, and a research associate at the Highway Safety Research Institute.

Mr. Arvai formerly served on the Boards of Directors of Liberty Aerospace, a manufacturer of light training aircraft; Giro, Inc., a company specializing in aircraft warranty management; Avatar Alliance, an aircraft spare parts provider, and iION Corporation, an early internet travel portal.

Mr. Arvai received a BSE degree in Industrial Engineering from the University of Michigan (with high distinction) and an MS in Industrial Administration from Carnegie-Mellon.   He is a Certified Public Accountant (not active in public practice), an instrument-rated pilot, has been widely quoted in major publications, including The Wall Street Journal, Newsweek, The New York Times, Houston Chronicle, and Los Angeles Times and has appeared as an industry expert on business oriented radio and television programs.

Assignments he has directed include:

General Aviation Industry Studies

- For a major manufacturer of business jet aircraft, Mr. Arvai directed a market research team to develop the criteria for a new mid-sized business jet.   That research developed a set of "ideal market criteria" with respect to speed, range, cabin size, runway performance, price, and other factors deemed important by potential customers reached through both surveys and focus groups.   The study resulted in the recommendation to



14

The Arvai Group, Inc.
Written Report of Ernest S. Arvai

choose one of six potential design alternatives, and the design chosen went on to become the industry leader in its market segment

- For a major manufacturer of light and turboprop personal and business aircraft, he developed a revised distribution strategy that separated heavy business aircraft from personal aircraft to better utilize specialized resources and training.  As a result of his recommendations, sales in each business sector rose after implementation of the new structure.

- For a manufacturer of general aviation aircraft, he directed several projects related to planning, product improvement and meeting aimed at helping the aircraft reach a broader market, and better differentiate it from its competition.

- For a major manufacturer of business and regional jets, he directed a study related to the corporate shuttle and sports team markets, determining the appropriateness of various products for those purposes.

- For a new entrant contemplating a re-engining program for a popular business jet, he assessed the market and estimated the market value of a Supplemental Type Certificate for that aircraft conversion program.

- On several occasions, Mr. Arvai has served as an expert regarding economic damages to business aircraft that have been damaged, including the impact of prior damage on aircraft value, lost utilization of the aircraft, and other factors.

Mr. Arvai was formerly Vice President and Managing Director, Technology Management at Battelle Memorial Institute, where he was responsible for the research institute's activities in global management consulting. Prior to his tenure at Battelle, he was a Director at Arthur D. Little, Inc. where he was responsible for the firm's worldwide activities in the Airline and Aviation Industries, headed that business unit, and co-directed the firm's practice in travel, tourism and hospitality.  Earlier in his career, he was a consultant with Arthur Andersen & Company, and a research associate at the Highway Safety Research Institute.
Mr. Arvai formerly served on the Boards of Directors of Liberty Aerospace, a manufacturer of light training aircraft; Giro, Inc., a company specializing in aircraft warranty management; Avatar Alliance, an aircraft spare parts provider, and ilON Corporation, an early internet travel portal.

Mr. Arvai received a BSE degree in Industrial Engineering from the University of Michigan (with high distinction) and an MS in Industrial Administration from Carnegie-Mellon.  He is a Certified Public Accountant (not active in public practice), an instrument-rated pilot, has been widely quoted in major publications, including The Wall Street Journal, Newsweek, The New York Times, Houston Chronicle, and Los Angeles Times and has frequently appeared as an industry expert on business oriented radio and television programs.



The Arvai Group, Inc.
Written Report of Ernest S. Arvai

## EXPERT TESTIMONY AND LITIGATION SUPPORT EXPERIENCE OF ERNEST S. ARVAI

2013: Expert report and pending testimony in three cases between aircraft owners and an aircraft manufacturer regarding economic damages resulting from an inability to support and maintain the aircraft and subsequent diminution of value.

2012-2013: Expert advisor to the Unsecured Creditors Committee in the Hawker Beechcraft bankruptcy.

2012: Expert advisor to the Secured Creditors in the Southern Air bankruptcy, with a focus on aircraft lease renegotiations and fleets.

2011-2012: Preparation of an expert report and testimony in a dispute between a commercial airline and an engine maintenance provider regarding a breach of contract and economic considerations.   Expert testimony in an arbitration hearing.

2011-2012: Preparation of an expert report regarding the diminution in value of a commercial aircraft in process of conversion to an executive aircraft that resulted in a dispute between the parties.   Testimony at an arbitration hearing.

2011: Preparation of an expert report related to a dispute between aircraft owners and an aircraft manufacturer regarding the diminution in value of aircraft resulting from the failure of an engine manufacturer and the aircraft manufacturer building alternative engines.

2010-2011: Resubmission of an expert report in an appeal of a previous case, with expectations of additional testimony regarding values of aircraft as of a relevant date.

2010-2011: Expert report, depositions and pending testimony regarding economic damages regarding a breach of contract by an aviation parts manufacturer, circumvention of an international distribution relationship, and economic damages related thereto.

2010-2011: Expert report prior to testimony in an on-going case involving an FBO and an airport authority in which plaintiff is claiming discrimination against the airport authority and seeking economic damages.

2009-2010: Expert advice to counsel regarding consequential damages in support of litigation related to the delivery of components to an aircraft manufacturer that did not meet specifications, causing several accidents, a grounding of the fleet, and damage to the company's reputation. This litigation was settled prior to trial

2009: Expert advice to counsel regarding the applicability of a patent related to the delivery of airline boarding pass information via cellular telephones, and alternative technologies in use by the industry.



**The Arvai Group, Inc.**
**Written Report of Ernest S. Arvai**

2009: Expert advice to counsel regarding a matter involving the purchase of a composite materials fabricator whose products were utilized in aviation applications

2009: Expert advice to counsel regarding a matter resulting from the crash of a helicopter.

2008-2010: Preparation of expert report in antitrust and anticompetitive behavior litigation between an aviation maintenance, repair and overhaul provider and a manufacturer of an aircraft subsystem.   This case is scheduled for trial.

2008: Expert advice to counsel in a trademark suit between an airline and on-line search engine.

2007: Estimation of damages and value loss resulting from ground handling damage to a long-range executive aircraft while the aircraft was in maintenance.

2007-08: Estimation of potential lost market revenues and profits in international markets from a program to re-engine a piston engine aircraft with advanced turboprop engines, including testimony in the United States Court of Federal Claims on this takings case.

2007: Estimation of damages resulting from a patent infringement and release of trade secrets related to upgrading business aircraft with advanced technologies.

2006-2007: Expansion of scope of advice and testimony in insurer/aircraft lease portfolio dispute to represent a consortium of eight insurers in addition to the single entity.   Analysis resulted in settlement of case prior to trial.

2006-2007: Expert advice to counsel and testimony in a dispute between an insurer and the aircraft leasing arm of an aircraft manufacturer resulting from losses related to an insured lease portfolio.   Expert analysis focused on econometric modeling, forecasting and due diligence efforts by the insurers resulted in settlement of case prior to trial.

2006-07: Preparation of an economic analysis of damages in a dispute between a supplier and a manufacturer of very large corporate jets related to the treatment of revenues in a risk-sharing arrangement.   This litigation entailed a review of each aircraft sold and the internal cost-accounting allocations associated with those sales.   The case was settled prior to trial using our damage calculations.

2005-2006: Preparation of an expert report and economic damages calculations for an arbitration hearing before the American Arbitration Association between a structural component supplier and a manufacturer of business jet aircraft.

2004-2005: Preparation of an expert report and testimony in an arbitration hearing before the American Arbitration Association regarding the potential market and economic damages from the cancellation of a contract for a business jet re-engining program.



**The Arvai Group, Inc.**
**Written Report of Ernest S. Arvai**

2004: Preparation of an expert report regarding pre-delivery damage to an executive aircraft, and the diminution of value of the aircraft resulting from that damage.   Our analysis discovered a statistically significant difference on a key safety issue between the subject aircraft and its major competitors, which was incorporated in our expert report and affidavit. This case was adjudicated in the Province of Quebec, Canada.

2003-2004: Preparation of an expert report regarding diminution of value for commercial aircraft that had been modified to freighter configuration and subsequently grounded after the FAA rescinded approval, and economic damages resulting from the grounding of that aircraft.

2002: Preparation of expert report regarding diminution of value of Gulfstream aircraft as a result of a ground-induced accident and subsequent maintenance.

2001-2002:   Expert testimony at trial regarding a freighter conversion of several Boeing 747 commercial aircraft and their market value.

1999-2000: Expert testimony and expert reports regarding market values of commercial aircraft modified to cargo configuration, as well as storage and maintenance practices.

1998-9: Expert testimony regarding maintenance charges and costs resulting from a maintenance contract for airframe and engine overhaul of a wide-body jet.   This litigation was adjudicated in Hong Kong.

1997:   Expert Testimony regarding airline maintenance practices in a legal action by the owner of an aircraft against an airline related to changes in the airline's maintenance practices.

1997: Expert testimony regarding the market conditions for an aircraft re-engining program in which one party claims breach of contract by the other party, who pulled out of the joint arrangement and caused the program, to develop a supplemental type certificate, not to go forward.

1996: Expert testimony regarding aircraft performance guarantees between an airline customer and an airframe manufacturer.   In this situation, the aircraft in question did not meet its designed range criteria, causing the airline not to be able to fly certain planned routes non-stop, causing economic damage and a cancellation of the aircraft order.     This litigation was settled.

1995: Expert support and preparation of an expert report regarding the financial condition of a helicopter company in bankruptcy and the reasonableness of key expenditures for aircraft and their financing arrangements, and key operating and maintenance expenditures.   The litigation was settled prior to testimony.



18

**The Arvai Group, Inc.**
**Written Report of Ernest S. Arvai**

1996: Testimony before the Governor's Blue Ribbon Commission in Alaska regarding the proposed state guarantees of an Employee Stock Option Plan for MarkAir, a carrier with significant history and employment in Alaska.

1994: Testimony before the State of Minnesota, Legislative Committee regarding state economic development funding for the establishment of maintenance and reservations facilities for Northwest Airlines in northern Minnesota.

1991:   Testimony before the State Legislature in Minnesota regarding the financial condition and economic outlook for Northwest Airlines in conjunction with proposed state financing assistance for aircraft and engine maintenance facilities in northern Minnesota.

1989:   Testimony before the Department of Labor regarding a proposed sale of leasehold interests in the Worldport Terminal at JFK airport by Pan Am to certain of its pension plans.

1988:   Testimony in an action between an aircraft manufacturer and supplier regarding proprietary rights and aftermarket spares sales for certain aircraft components, including issues related to PMA (parts manufacturing authority) and STC (supplemental type certificate) modifications



The Arvai Group, Inc.
Written Report of Ernest S. Arvai

**Appendix B: Documents Considered in this Analysis**

1. Premier Aircraft Sales, Aircraft Sales Agreement dated February 6, 2007
2. Premier Aircraft Sales, Commercial Invoice dated September 24, 2007
3. Aircraft Guaranty Trust Aircraft Lease Agreement between Karsten Damgaard-Iversen and Continent Aircraft Trust No. 1087 dated August 2, 2007
4. FAA Aircraft Bill of Sale for N56KD
5. FAA Aircraft Registration to Aircraft Guaranty Title LLC, Trustee for N56KD
6. AXA insurance documentation
7. Flight Log for Ferry Flight from London, Ontario to Aarhus, Denmark
8. Karsten Damgaard-Iverson personal flight logbook
9. Diamond Customer Assistance Program signup sheet executed by Mr. Damgaard Iversen
10. Various maintenance invoices over life of aircraft
11. Aircraft Technical Logs - Airframe
12. Aircraft Technical Logs - Installations and Modifications
13. Engine Logbooks
14. Propeller Logbooks
15. Notebook with Maintenance Records for N56KD
16. Guaranty for Thielert 2.0 engine
17. Diamond Customer Assistance Program
18. EASA/Diamond Aircraft Meeting 20.05.08 presentation materials





**The Arvai Group, Inc.**
P.O. Box 468
Windham, New Hampshire 03087-0468
United States

telephone: +1.603.894.0000
www.ArvaiGroup.com